CAUSE No. D34882-CR

DATE: 8/19/15

83,668-01

TO: JOSHUA B. TACKETT

DISTRICT COURT OF NAVARRO Co.

300 WEST 3rd AVE, STE. 201

P.O. BOX 1439

CORSICANA, TX. 75151

Re: MOTION FOR RECONSIDERATION OF 11.07's MEMORANDUM OF LAW

FROM: FILIBERTO RAMOS #1866723 D4-26

TERRELL UNIT

1300 FM 655

ROSHARON, TX. 77583

Dear Mr. Tackett,

Enclosed is a motion in which I pray can be added to my original 11.07 sent out June 12th, 2015. I am forwarding a copy of the documents including the memorandum of law to the court of criminal appeals. Thank you in advance for your reconsideration.

Respectfully,

Filiberto Ramos #1866723

RECEIVED IN
COURT OF CRIMINAL APPEALS
AUG 24 2015
Abel Acosta, Clerk

CAUSE # 034882-CR

GILBERTO GOMEZ          §          IN THE 13th JUDICIAL

V          §          DISTRICT COURT

§          OF

STATE OF TEXAS          §          NAVARRO COUNTY

MOTION TO AMEND MEMORANDUM OF LAW TO 11.07 AND
RECONSIDERATION OF JUDGEMENT

COMES HERE, ON AUGUST 19, 2015, PETITIONER RESPECTFULLY,
GILBERTO GOMEZ REQUESTS AMENDMENT OF MEMORANDUM OF LAW
TO MY ORIGINAL 11.07 APPLICATION SUBMITTED ON JUNE 12, 2015.
APPLICANT PRAYS COURTS RECONSIDER JUDGEMENT MADE ON THIS
CASE. I AM FORMALLY REQUESTING A COPY OF DA'S REPLY TO MY
11.07.

GROUNDS

1) JUDGEMENT OF THE DISTRICT COURT WAS UNREASONABLE,
UNFAIR, ARBITRARY, AND CAPRICIOUS.

2) NEVER SAW DISTRICT ATTORNEY'S REPLY AND THEREFORE I
DID NOT GET MY CHANCE TO REPLY AND ONLY SAW
ORDERS FROM JUDGE, WHICH I WANT TO REQUEST A COPY.

3) FOR THE COURTS TO SEE THE CONSTITUTIONAL VIOLATIONS WHICH
ARE FOUND TO BE EGREGIOUS AND VERY HARMFUL IN DEFENDANT'S
CASE.

4) ACCORDING TO ART 11.07 SECTION 3 IT STATES THAT DA SHALL
HAVE TO REPLY TO APPLICANTS HAWKINS CORPUS, THE NEXT MAIL I GOT
WAS A COPY FROM THE DISTRICT CLERK AT NAVARRO OF COURT OF CRIMINAL
APPEAL'S NOTICE THAT THEY HAD RECEIVED THE PACKET EXACTLY OR CLOSE
TO 45 DAYS. NEVER GOT THE WITHIN 20 DAY RESPONSE FROM DA'S OFFICE.

## PRAYER

PETITIONER HOPES AND PRAYS THE GRANTING OF THIS MOTION IN ORDER THAT JUSTICE MAY BE SERVED ON THIS ——— DAY OF ——— 2015, IS NOW HEREBY SUBMITTED TO HONORABLE JUSTICE

GRANTED                    DENIED


CC: FILE, AND TRANSMIT TO:                    ———————
   COURT OF CRIM APP                    JUDGES SIGNATURE


## CERTIFICATE OF SERVICE

I, ALBERTO GOMEZ, HEREBY CERTIFY UNDER PENALTY OF PERJURY THAT A TRUE AND CORRECT COPY OF THE NOTICE OF MOTION FOR AMENDMENT OF MEMORANDUM OF LAW TO H.C.I AND RECONSIDERATION OF JUDGEMENT HAS BEEN FORWARD TO JOSHUA B. TACKETT COUNTY CLERK OF NAVARRO COUNTY ALONG WITH A COPY TO ABEL ACOSTA FROM THE COURT OF CRIMINAL APPEALS IN AUSTIN, TX, BY PLACING SAID MOTION, MEMO OF LAW AND SUPPORT NOTES AND EVIDENCE IN A POSTAGE PAID ENVELOPE AND MAILING SAID ENVELOPE THIS 20th DAY OF AUGUST TO JOSHUA B TACKETT, DISTRICT CLERK OF NAVARRO COUNTY AND ABEL ACOSTA, CLERK OF COURT OF CRIMINAL APPEALS OF TEXAS

X _____                    8/20/15
   ALBERTO GOMEZ #1866723 D4-26            DATE
   CT TERRELL UNIT
   1300 FM 655
   ROSHARON, TX. 77583

Mailed on: 8/17/15

Gilberto Gomez #1866723 D4-26
C.T. Terrell Unit
1300 FM 655
Rosharon, TX. 77583

Court of Criminal Appeals of Texas;
Abel Acosta
P.O. Box 12308
Capital Station
Austin, TX. 78711

RE: District Court Records Writ #83,668-001 Case# D34882

Dear Mr. Acosta,

Please find enclosed a copy of the objections I have filed with the District Court.

Additionally, please forward me a copy of the record the District Court has transmitted to you in my writ of habeas application, including, but not limited to a copy of my original 11.07 habeas application, a reply by the prosecution, and a reply by the judge thereto. or my 11.07

If there was a reply filed by the prosecution (none was ever served to me) I respectfully request that I be granted an opportunity to respond to said reply.

Thank you for your kind consideration,

Gilberto Gomez, #1866723

Objection to Judge's decision on

Gomez v. State, case#D34882-CR

The District Court incorrectly concludes that my case is without merit, as the following attached case law as applied to my facts demonstrates.

District Court concluded that attorney reviewed case but it fails to state a basis for that ~~conclusion~~ finding of fact and conclusion. The same can be said of every other ~~finding~~ finding of fact and conclusion made by the District court. (see discussion, infra).

## Memorandum of Law
### Defendant Gomez   Case # D34882-CR

## Statement of Facts

In 11.07 application from, plaintiff has set forth the facts underlying said application. With respect to the legal argument relating to the facts supporting Ground One and Ground Two, see Point I, infra. With respect to the legal argument relating to the facts supporting Ground Three, see point Two.

Defendant respectfully submits this Memorandum of Law in support of his application for 11.07 Writ of Habeas Corpus (hereinafter "Application") received and presented to the Court of Criminal Appeals of Texas on July 30th, 2015. Because of his status as a layman and non-attorney, defendant did not include said pro-se applicant memorandum with his initial filing of the application, in the interests of Justice, Defendant respectfully requests, the Court to overlook Defendant's technical error(s) pursuant to Haines v.Kerner 92S.Ct 594 (1972). Applicant is proceeding pro-se due to the inability to retain counsel. Plaintiff invokes the procedural standards of review set forth in Haines v. Kerner, Id., holding "Pro Se Pleadings are to be construed liberally and held to less stringent standards than pleadings drafted by Lawyers. Further, if the Courts can reasonably construe the pleadings to state a valid claim upon which a litigant could prevail, it should do so

despite any failure to cite proper authority, confession of legal theories or principals, poor construction of lack of form. See also _Smith v Dretke_, 422 F.3d 269 at 276 (5th Cir 2005): "The stakes in habeas cases are too high for a game of legal 'gotcha.'" (See also _Schneider v Delo_ 85 F.3d 335 at 339 (8th Cir 1996). In these instances, hair splitting attacks on what has been called 'hyper-technical' and exacting standards were used by State in assailing pro-se petitions for habeas corpus.

Point:

I. PURSUANT TO THE INEFFECTIVE ASSISTANCE OF COUNSEL, Ms. Ronica, DEFENDANT GOMEZ WAS UNCONSTITUTIONALLY DENIED HIS SIXTH AMMENDMENT RIGHT TO COUNSEL BECAUSE (1) HER FAILURE AS ATTORNEY TO INVESTIGATE AND THEREUPON MOVE TO SUPPRESS AN ILLEGALLY OBTAINED CONFESSION WAS A FAILURE OF ATTORNEY PERFORMANCE FALLING BELOW AN OBJECTIVE STANDARD OF REASONABLENESS, AND (2) PLAINTIFF SUFFERED PREJUDICE BECAUSE THERE IS A REASONABLE PROBABILITY THE RESULT OF THE TRIAL WOULD HAVE BEEN DIFFERENT BUT FOR ATTORNEY'S (RONICA) FAILURE TO INVESTIGATE AND MOVE TO SUPPRESS SAID ILLEGALLY OBTAINED CONFESSION, WHICH SHE HERSELF CHARACTERIZED TO DEFENDANT AS THE FOUNDATION FOR THE PROSECUTOR'S CASE.

Attorney Ronica's failure to investigate upon her client Gomez' information of alleged police misconduct and thereafter make a motion to suppress Defendant's confession and, at minimum, improve her negotiating position against the prosecution (said motion to suppress having more than a reasonable probability of success, see discussion at _infra_)

(1) Such failure to investigate was a failure of attorney performance falling below the objective standard of reasonableness, and (2) said client suffered prejudice as a result of attorney's failure to investigate the alleged police misconduct. See Wyatt v. United States, 574 F.3d 455, 457-458 (7th Cir. 2009) citing Strickland v. Washington, 466 U.S. 668, 687-688, 693, 104 S.CT 2052, 80 L.Ed.2d 674 (1984).

On or about June 12, 2013, Defendant informed his counsel Ronica that:

1) His "confession" to police detectives had been coerced (see discussion at infra)

2) He did not have adequate understanding whether police had ~~properly~~ given him a Miranda warning (see discussion at infra)

3) That police seized his cell phone without having a warrant authorizing them to do so (See discussion at infra.)

4) That police used their unauthorized possession of said cell phone as a weapon to coerce, threaten and intimidate defendant into "confessing" (see discussion at infra)

5) That he suffered from mental illness and substance addictions (see discussion, particularly in point II, infra),

Attorney Ronica failed to investigate plaintiff's statements given to her as set forth in "1" to "4" supra. She failed to act upon said information and therefore breached her duty to investigate as Defendant's counsel (and her consequently arising duties to make a motion to suppress

Defendant's confession and, at minimum, improve his negotiating position against the prosecution, based on the findings of such an investigation and, with reasonable probability, exclude use of the confession as evidence at trial. Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary. Strickland v. Washington, 104 S. Ct. at 2066.

In the instant case, counsel's failure to investigate whether the confession had been ~~coerced~~ **SEE EXHIBIT B** and the related issue of illegal search and seizure of Defendant's cell phone could not have constituted a "reasonable decision that makes particular investigations unnecessary." Why? Because in the estimation of Counsel, Donica herself (expressed to the defendant), there was "no alternative", other than going to trial and get life in prison, but to plead guilty because he had "confessed". In other words, Donica "resolved" the case on the basis of a "confession" which her client had told her was coerced and which she failed to investigate. This was not reasonable insofar as the reasonableness of Donica's actions could not have been "determined or substantially influenced" by Defendant's statements or actions when those statements or actions were an outcry to his attorney that his confession had been coerced by the police Strickland at 2066. At the very least, this court should make "inquiry into counsel's conversations with Defendant"

in order to properly assess counsel Donica's investigation decision (or, more aptly in this case, non-decisions). Strickland, Id., citing United States v. Decoster, 199 U.S. App DC 359 (1979) at 372-373; 624 F.2d 196, at 209-210.

Attorney Donica's failure to investigate Defendant's outcry that his confession was coerced constituted an effective denial of his right to counsel in violation of the Sixth ammendment, thereby prejudicing his defense. SEE "EXHIBIT B"

Again, Donica "resolved" the case on the basis of a "confession" which plaintiff had told her was coerced; she did nothing in response to Defendant's outcry and did not oppose a prosecution which was based on said "confession". Such a "resolution" amounted to a constructive denial of Defendants right to counsel thereby violating his Sixth Ammendment rights and, as matter of legal presumption, prejudicing his defense. Strickland at 2067.

Furthermore, Attorney Donica failed to investigate Defendant's statement that Detectives Nanny and Clad had seized his cell phone without a warrant and used said cell phone to coerce his confession* (Similarly, Donica failed to follow up on plaintiff's statement that he did not remember being properly Mirandized.)* SEE "EXHIBIT C"

Said Police seized Defendant's cell phone and searched

it's contents without a warrant aimed upon probable cause; therefore, under Fourth and Fourteenth Amendments, said search and seizure was per se unreasonable. U.S.C.A. Const. Amend 4,14; Flores v State, 172 S.W.3d 742. The police coerced Defendant into handing over his cellphone by commanding him to do so, as follows: One of the officers, Detective Cloud, who was armed and had been intermittently pointing his hand on his holster, raised his voice at plaintiff, "You can't make or answer any calls in here; hand it over!" Thoroughly intimidated by Det. Cloud's angry comment, Defendant involuntarily handed his cell phone over to Detectives Cloud and Nanny -- in effect, therefore, said Detectives confiscated (seized) Defendant's cell phone.

Accordingly, since plaintiff's "consent" was not voluntary, said detectives seizure of the cell phone without a warrant did not fall within one of the specifically established exception to the requirements of both a warrant and probable cause: that the defendant voluntarily consented to the search. U.S.C.A. 4,14; Flores v. State, 172 S.W. 3d 742

Moreover, pursuant to Detectives Clouds and Nanny's unconstitutional seizure of Defendant's cell phone, the State conducted a warrantless search of said phone's contents, thereby adding to the State's case against Defendant, it's plea bargaining posture and negotiating position toward him, adversely impacting the decision as to the penal code section under which Defendant would be charged

and it's ultimate sentencing recommendation. Before the "confession", Defendant was charged with P.C. 22.021(a)(2-B) Aggravated Sexual Assault of a child after the "confession", the prosecution increased the charge to P.C. 21.02 (ontinuous Agg Sexual Assault of a child, Jessica's law no possibility of parole contrary to Donica's plea bargain negotiation stated to Defendant. Defendant did not learn of this law's "no parole" feature until learning about it at the C.T. Terrel Unit Law Library in Jan. 2015 -- an crucial fact which his Attorney Donica, under objectively reasonable standard of competence, was professionally obligated to disclose to him during the course of the prosecution, not only did she fail to disclose 21.02 "no parole" feature but she actively compounded her professional malfeasance by falsely stating that defendant would be paroled in 12.5 years if he agreed to the plea. Therefore, Attorney Donica's failure to investigate said warrantless search prejudiced her client (in addition to the prejudice produced coerced confession and induced plea bargaining agreement, see infra).

Courts hold that(1) a person has a subjective expectation of privacy in the contents of his cell phone, and (2) this expectation of privacy is one society recognizes as reasonable and legitimate, Texas v. Granville, PD-1095-12, citing United States v. Wurie, 612 F.Supp.2d 104,109 (Mass.2012) ("It seems indisputable that a person has subjective expectation of privacy in the contents of his or her cell phone."), reversed on other grounds, 728 F.3d 1 (1st cir 2013) (cert. granted, 82 M.S.L.W 3104 (U.S. Jan. 17, 2014)(No. 13-212) (upholding defendants

privacy interest and holding that warrantless search of cell phone taken from an arestee was unconstitutional).

"A person's subjective expectation of privacy in a cell phone that he owns and possesses is supported by decades of cases in "standing" (Granville at 9; a copy of the entire Granville decision is annexed hereto as exhibit "A").

Moreover, the search incident to an arrest exception "does not authorize the warrantless search of data on a cell phone seized from an arestee's person because the Government has not convinced us that such a search is ever necessary to protect arresting officers or preserve destructible evidence." United States v. Wurie, 728 F.3d 1, 3 (1st Cir. 2013), cert. granted, 82 U.S.L.W. 3104 (U.S. Jan. 17, 2014) (No. 13-212) (emphasis supplied (see also State v. Smith, 920 NY2d 949, 955 (Ohio 2009) (noting in a case involving the warrantless search of an arestee's cell phone incident to arrest, that "Once the cell phone is in police custody, the state has satisfied it's immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost or erased. But because a person has a high expectation of privacy in a cell phone's contents, police must then obtain a warrant before intruding into the phone's contents" Emphasis Supplied.)

Moreover, Detectives Nunny and Cloud compounded the illegal seizure of the cell phone by stating to Defendant

that if they found anything possibly incriminating on the cell phone which they had unconstitutionally seized without a warrant (see discussion, supra), the defendant "would be given more time." Thus threatened, the Defendant "confessed."

The above-referenced threat by the defendant which was part-and-parcel of their unconstitutionally warrantless seizure of defendant's cell phone, created a "totality of circumstances" under which the "confession" was obtained in a manner incompatible with the requirements of the constitution. Miller v. Fenton, 474 U.S. 104, 112, 106 S.CT. 445, 88 L.Ed 2d 405 (1985). The test is whether considering the totality of circumstances, the Government obtained the statements by psychological coercion or by improper inducement so that the suspect's free will was overcome. U.S. v. Glover, 104 F.3d 1570, 1579 (quoting Davis v. North Carolina, 384 U.S. 737, 741-742, 86 S.CT.1761, 16 L.Ed.2d 895 (1966). In the case at bar, the detectives overreached and improperly seized Defendant's cell phone in order to use it as a threat to coerce Defendant's "confession"; this constituted, in the totality of the circumstances, "psychological coercion" and "improper inducement" as per Glover, Id. and Davis, Id.

In Colorado v. Connelly, 479 U.S. 157, 167, 107 S.CT 515, 93 L.Ed 2d 473 (1986) the U.S. Supreme Court held that "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of Due

Process Clause of the Fourteenth Amendment." The court went on to emphasize that in the "confession" cases it had decided over the previous fifty years, the "crucial element" had been the presence of "police overreaching." Id. at 163, 107 S. Ct. 515. Accordingly, it is clear after Connelly that a confession is involuntary under the Fourteenth Amendment if the police used coersive activity to undermine the subject's ability to exercise his free will. In the instant case, Detectives Nanny and Claud used such coersive activity to undermine the suspects ability to examine his free will inasmuch as they illegally seized, his cell phone and then threatened him with more prison time if their unconstitutional search of said phone revealed anything that they deemed incriminating.

"When the Government obtains incriminating statements through acts, threats, or promises which cause the defendants free will to be overborne, it violates the Defendant's Fifth Amendment rights and the statements are inadmissable at trial as evidence of Guilt." United States v. Tiles, 297 F.3d 959, 965 (10th cir. 2002). Attorney Ponica ignored Defendants outcry that the confession had been coerced. She made no motion to supress evidence based on outcry. Such a motion, at the very least, would have given Defendant negotiating leverage with the prosecution and would have affected such things as which penal code section was to be charged to Defendant and the ultimate sentencing recomendation. Instead, she bullied him into pleading guilty because,

in her excited words, "you confessed!" Attorney Donica's failure to investigate (and act upon) the "totality of the circumstances" surrounding the defendant's constitutional right to counsel under the Sixth Amendment.

Point II: Attorney Donica's Ineffective Assistance of Counsel Caused Defendant to Enter Unknowing and Involuntary Plea

Attorney Donica misrepresented to her client the consequences of pleading guilty to Continuous Agg. Sxl. Assault of a Child. Penal Code 21.02 specifically knowing full well that Defendant plea agreement would mean that he would be doing 25 years flat with no opportunity for parole, she lied to him and told him that he would be paroled and only do half or 12.5 years of sentence. Even when plaintiff repeatedly asked "Will I be paroled at 12.5 years?" "will I be paroled in 12.5 years?", Attorney Donica repeatedly answered "Yes, yes, yes -- 12.5 years." Pursuant to Ms. Donica's misrepresentations Defendant entered into the plea agreement. Such misrepresentations of the law necessarily made Ms. Donica ineffective as plaintiff's counsel, falling below any objective standard of competence, lack of loyalty, and abandonment of the Defendant.

Ineffective Assistance of Counsel prevents a defendant from entering a knowing and voluntary plea. See Tollett v. Henderson, 411 U.S. 258, 266-267 (1973). To demonstrate ineffective counsel, a defendant must show two things. First, the defendant must show that counsel's assistance was not

"within the range of competence demanded of attorneys in criminal cases" (plaintiff respectfully exhibits that attorney misrepresentation of the consequences of pleading guilty to penal code 21.02, ie, "Jessica's law" ipso facto falls outside the range of competence demanded of attorney in criminal cases"), see, e.g., U.S. v hordon 156 F.3d 376, 380 (2nd cir. 1998) (assistance ineffective because of counsel's gross underestimation of defendants potential sentence in letter to defendant fell prevailing professional norms); U.S. v. Grammas, 376 F.3d 433, 436-437 (5th cir. 2004) (assistance ineffective because counsel unfamiliar with Sentencing Guidelines and substantially mistated potential exposure of Defendant if found guilty); Maples v Stegall, 340 F.3d 433, 439-440 (6th cir. 2003) (assistance ineffective because failure to advise defendant guilty plea would preclude defendant from appealing speedy trial claim fell below objective standard of reasonableness.)

In this connection, the court should take particularly special note of Julian v. Bartley, 495 F.3d 487, 497-500 (7th cir. 2007) (assistance ineffective because counsel advised defendant maximum sentence was one half of actual sentence, causing him to accept guilty plea he would have otherwise rejected) and U.S. v. Hanson, 339 F.3d 983, 990 (D.C. cir. 2003) (assistance ineffective because incorrect estimate of likely sentence based on ignorance of law counsel should have known and therefore fell below objective standard of competence).

Second, the defendant must show that a reasonable probability exists that he would not have pled guilty had counsel

been competent. It is evident that plaintiff only accepted plea based on Danica's holding out to him the hope of parole at 12.5 years. See, e.g., Meyers v. Gillis, 142 F.3d 664, 668 (3rd Cir. 1998) (defendant prejudiced by counsel's erroneous advise leading him to plead guilty to second-degree murder because record suggested he would not have pleaded guilty if he had known he would be ineligible for parole), Julian v. Bartley, supra (defendant prejudiced because counsel told him he faced a maximum of 30 years in prison when he faced 60), U.S. v. McMullen, 86 F.3d 135, 137 (8th Cir. 1996) (district court's failure to determine whether defendant's choice of plea was prejudiced by counsel's errors regarding possible sentencing warranted remand).

Furthermore, Attorney Danica failed to investigate and raise issue of Defendant's mental competency throughout all stages of the prosecution including the issue of his mental state at the time of his "confession" (see discussion regarding the overbearing of his will and coersion by detectives, supra) and at the entering of the plea in particular.

Not only did he make her aware of his life long struggles with mental illness and substance abuse (severe anxiety, drug and alcohol addictions), she knew that the Navarro County Jail had him in 24-hour watch in high risk cell because of his mental instability. Yet, she failed to have her client's mental competency evaluated; she failed to raise it with the court. See Ivy v. Casper, 173 F.3d 1136, 1143 (8th Cir. 1999) (assistance ineffective because counsel failed to advise murder defendant of possible defense of mental illness and failed to bring to court's atten-

tion psychiatrist's report indicating mental disease).

As Defendant's counsel, Attorney Panica ... being aware of her client's mental illness (of severe anxiety) and substance abuse history -- was obligated, at minimum, according to objective standards of competency, to advise the court of that history at the plea hearing, especially in light of U.S. v. Damon, 191 F.3d 561, 564-65 (4th Cir. 1999) (plea invalid because court did not make further inquiry into competency after learning defendant under medication listing "impaired judgement" as side effect), SEE EXHIBIT "D" Burt v. Uchtman, 422 F.3d 557, 566 (7th Cir. 2005) (plea invalid because court should have conducted competency hearing after learning defendant's history of psychotropic medications and difficulty remaining alert), and Shafer v. Bowersox, 329 F.3d 637, 648-51 (8th Cir. 2003) (plea invalid because court conducted only limited colloquy despite undisputed expert testimony defendant was prone to make impulsive and irrational decisions).

Wherefore, for all the reasons stated herein, Applicant (Gilberto Gomez) prays that the court grant applicant relief to which he may be entitled in this proceeding, including but not limited to the court overturning applicant's conviction, or, in the alternative, remanding his case for trial



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1095-12

### THE STATE OF TEXAS

v.

### ANTHONY GRANVILLE, Appellee

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE SEVENTH COURT OF APPEALS
## WALKER COUNTY

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, PRICE, WOMACK, JOHNSON, HERVEY, and ALCALA, JJ., joined. KELLER, P.J., filed a concurring opinion in which PRICE, J., joined. KEASLER, J., filed a dissenting opinion.

## OPINION

This case raises the issue of whether a person retains a legitimate expectation of privacy in the contents of his cell phone when that phone is being temporarily stored in a jail property room.[1] The trial judge granted Anthony Granville's motion to suppress, concluding

---

[1] We granted the State Prosecuting Attorney's (SPA's) sole ground for review which asks, May law enforcement, with or without probable cause, activate and search the

that the high-school student did not lose his legitimate expectation of privacy in his cell phone simply because it was being stored in the jail property room after he had been arrested for a Class C misdemeanor.  The court of appeals affirmed that ruling.[2]  We granted the SPA's petition for discretionary review, but we reject its argument that a modern-day cell phone is like a pair of pants or a bag of groceries, for which a person loses all privacy protection once it is checked into a jail property room.  We therefore affirm the judgment of the court of appeals.

## I.

One morning, Anthony Granville was arrested for the Class C offense of causing a disturbance on the school bus.  His cell phone was taken from him during the booking procedure and placed in the jail property room.  Later that day, Officer Harrell, a Huntsville Police "School Resources Officer," was told that, the day before he was arrested, Mr. Granville had used his cell phone to take a photograph of another student urinating in the boys' bathroom.  Officer Harrell, who was not involved in arresting Mr. Granville, then drove to the jail and retrieved the cell phone from the jail property room.  He examined its contents without first getting a warrant.  The officer turned on the phone, which had been turned off.  He went through it until he found the photograph he was looking for, then took

---

contents of an inventoried cellular phone that was immediately associated with the person at the time of his lawful arrest?

[2] *State v. Granville*, 373 S.W.3d 218, 227 (Tex. App.–Amarillo 2012) (fact that defendant's cell phone was in jail property room did nothing to "nullify" his "reasonable expectation of privacy in the phone searched.").

the phone to his office, and printed a copy of the photograph. He kept the phone as evidence.

Mr. Granville was charged with the state-jail felony of Improper Photography, and he filed a motion to suppress, arguing that Officer Harrell could not search his cell phone without a warrant. At the hearing on the motion to suppress, both Officer Harrell and the prosecutor contended that if an officer has probable cause, he may search anything in the jail property room that belongs to a jail inmate. There are no exceptions. The trial judge tested this hypothesis by asking the prosecutor, "[D]o you agree that there is an expectation of privacy on the information the person has on their cell phone?" The prosecutor responded, "If you have it in your possession and not committed a crime, sure." She elaborated further:

> I think if you're in the Walker County jail you have no expectation of privacy in the personal effects that you had on you at the time that you were arrested. ... His expectation of privacy is diminished in those effects until he can and does exhibit subjective expectations through his conduct, presumably at the time of his release from detainment or incarceration.

Defense counsel disagreed: "[I]t is clear that everybody in this room has some subjective belief that their cell phone is private and it doesn't matter if it is lawfully seized by the cops."

The trial judge posed the legal issue nicely:

> So if I get arrested for jay walking out here this afternoon and get put in jail, any officer in town can go out there and go through my phone, cell phone, and might discover that I have a picture of Prometheus chained to a rock in the mountains and an eagle eating his liver out?

Yes, said the State; "If an officer has probable cause to believe that you committed a crime or evidence of that crime [is] on your phone, then, yes he can look at it. Otherwise, no he can't look at your phone because he wants to. He has to have probable cause."

After studying the law, the trial judge granted the motion to suppress and entered findings of fact, concluding that the cell phone was the personal property of Anthony Granville; Officer Harrell took possession of it without a warrant; and the officer "searched the contents of the cell phone until he found the photograph he sought."[3] Based on his factual findings, the trial judge concluded that Anthony Granville had a subjective, reasonable, and legitimate expectation of privacy in his cell phone "even when that cell phone [was] in the

---

[3] The trial judge's complete findings of fact are as follows:

1.  Anthony Granville was arrested and jailed for a class C misdemeanor of Disruption of School Transportation.
2.  When booked into the Walker County Jail, Anthony Granville's personal effects were taken from him by Walker County Jail personnel and placed into his property.
3.  Among the items taken from Anthony Granville by Walker County Jailers was a cell phone.
4.  The cell phone taken from Anthony Granville was the personal property of Anthony Granville.
5.  After his incarceration, Officer Everett Harrell, a school resource officer at the school Anthony Granville attends, heard from others at the school that Anthony Granville had taken a photograph of another student.
6.  Believing the taking of the photograph to be a possible criminal offense, Officer Harrell went to the Walker County Jail and took possession of Anthony Granville's cell phone.
7.  The cell phone was off and Officer Harrell had to turn it on to manipulate its controls.
8.  Officer Harrell [s]earched the contents of the cell phone until he found the photograph he sought.
9.  Officer Harrell seized the cell phone and checked it into property at the Huntsville Police Department.
10. Based on the content of the photograph allegedly taken by Anthony Granville, Anthony Granville was charged with the State Jail Felony offense of Improper Visual Photography.
11. At the time Officer Harrell took possession of Anthony Granville's phone, he had no valid search warrant.
12. Officer Harrell had sufficient time to obtain a search warrant for the contents of Anthony Granville's cell phone.
13. Officer Harrell took possession of Anthony Granville's cell phone and could have held it until a warrant could have been obtained.
14. No exigent circumstances existed that would have necessitated circumventing the search warrant requirement.

jail inventory of an accused." Because Officer Harrell had neither a search warrant nor exigent circumstances to make a warrantless search of that phone, the trial judge granted the motion to suppress.[4]

The State appealed, and the court of appeals affirmed, finding that (1) a person "has a general, reasonable expectation of privacy in the data contained in or accessible by his cell, now 'smart' phone,"[5] and (2) a person continues to have a reasonable expectation of privacy in the contents of his cell phone even though it has been placed in a jail property room for

---

[4] The trial judge's full conclusions of law were as follows:

1.  Officer Everett Harrell had no valid search warrant when he seized the cell phone belonging to Anthony Granville.
2.  Exigent circumstances did not exist to lawfully circumvent the necessity of obtaining a search warrant.
3.  The seizure of Anthony Granville's cell phone was not accomplished as a search incident to arrest.
4.  To the extent that probable cause was necessary for Officer Harrell to search the contents of Anthony Granville's cell phone, the Court finds that the State of Texas did not meet its burden in demonstrating probable cause as it wholly failed in its evidence to show that Officer Harrell had in his possession at the time he took possession of Anthony Granville's cell phone sufficient information to believe that a criminal offense has been committed by Anthony Granville, specifically that he did not state in his testimony that he had information that the photograph was taken without the consent of the student photographed or that the photograph was taken with the intent to invade the student's privacy.
5.  The Court finds that Anthony Granville had a reasonable expectation of privacy in the contents of his cell phone.
6.  The Court finds that Anthony Granville demonstrated subjective expectation of privacy in the contents of the cell phone.
7.  The Court finds that the expectation of privacy in the contents of one's cell phone is reasonable and one that society accepts as legitimate, even when that cell phone is in the jail inventory of an accused.

[5] *Granville*, 373 S.W.3d at 223.

safekeeping.[6] The court of appeals ended its opinion with a rhetorical flourish, noting that "[a] cell phone is not a pair of pants," like the pants and shoes whose warrantless seizure from the jail property room and later search and testing we upheld in *Oles v. State*.[7]

## II.

Appellate courts afford almost total deference to a trial judge's findings of fact in a suppression hearing as long as those factual findings are supported by the record.[8] We also view his factual findings in the light most favorable to his ruling.[9]

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated."[10] The term "papers and effects" obviously carried a different connotation in the late eighteenth century than it does today. No longer are they stored only in desks, cabinets, satchels, and folders. Our most private information is now frequently stored in electronic

---

[6] *Id.* at 224-27.

[7] 993 S.W.2d 103 (Tex. Crim. App. 1999).

[8] *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) ("Appellate courts afford almost total deference to the trial judge's determination of facts (if those facts are supported by the record) when they review a suppression ruling."); *see, e.g., State v. Betts*, 397 S.W.3d 198, 204 (Tex. Crim. App. 2013) (deferring to trial judge's factual findings and upholding trial judge's determination that defendant had reasonable expectation of privacy in his aunt's back yard where he kept his dogs).

[9] *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004) (appellate courts must defer to the trial judge's factual findings concerning a person's expectation of privacy and view them in the light most favorable to the prevailing party; ultimate legal issue of standing is reviewed *de novo*).

[10] U.S. CONST. amend. IV.

devices such as computers, laptops, iPads, and cell phones, or in "the cloud" and accessible by those electronic devices.[11] But the "central concern underlying the Fourth Amendment" has remained the same throughout the centuries; it is "the concern about giving police officers unbridled discretion to rummage at will among a person's private effects."[12] This is a case about rummaging through a citizen's electronic private effects–a cell phone–without a warrant.

## A.    Standing:    A Cell Phone Owner Has Both a Subjective and Reasonable Expectation of Privacy in His Cell Phone.

A person has "standing" to contend that a search or seizure was unreasonable if (1) he has a subjective expectation of privacy in the place or object searched, and (2) society is prepared to recognize that expectation as "reasonable" or "legitimate."[13] The "standing" doctrine ensures that a person may claim only that his own rights have been violated; he cannot assert that he is entitled to benefit because the rights of another have been violated.[14]

---

[11] *See* Bryan A. Stillwagon, Note, *Bringing an End to Warrantless Cell Phone Searches*, 42 GA. L. REV. 1165, 1194 (2008).

[12] *Arizona v. Gant*, 556 U.S. 332, 345 (2009).

[13] *Minnesota v. Olson*, 495 U.S. 91, 95-97 (1990) (an overnight guest in another's home has a legitimate privacy interest in that premises and thus may challenge its search); *Kothe v. State*, 152 S.W.3d at 59 (Tex. Crim. App. 2004) ("Any defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government invaded. He must prove that he was a "victim" of the unlawful search or seizure. He has no standing to complain about the invasion of someone else's personal rights.") (footnotes omitted).

[14] *Olson*, 495 U.S. at 95 ("Since the decision in *Katz v. United States*, 389 U.S. 347 (1967), it has been the law that 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of

A person's constitutional right to be free from unreasonable searches is a personal right that cannot be asserted vicariously.[15]

Courts have held that (1) a person has a subjective expectation of privacy in the contents of his cell phone,[16] and (2) this expectation of privacy is one that society recognizes

---

privacy in the invaded place.'") (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

[15] *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("[T]o claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable").

[16] *See United States v. Wurie*, 612 F. Supp.2d 104, 109 (D. Mass 2012) ("It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone."), *rev'd on other grounds*, 728 F.3d 1 (1st Cir. 2013), *cert. granted*, 82 U.S.L.W. 3104 (U.S. Jan. 17, 2014) (No. 13-212) (upholding defendant's privacy interest and holding that warrantless search of cell phone taken from an arrestee was unconstitutional). As the First Circuit explained in *Wurie*:

> We suspect that the eighty-five percent of Americans who own cell phones and "use the devices to do much more than make phone calls," . . . would have some difficulty with the government's view that "Wurie's cell phone was indistinguishable from other kinds of personal possessions, like a cigarette package, wallet, pager, or address book, that fall within the search incident to arrest exception to the Fourth Amendment's warrant requirement. In reality, "a modern cell phone is a computer," and "a computer . . . is not just another purse or address book."

*Id.* at 8 (citations omitted); *see also United States v. DiMarco*, ___ F.Supp.2d ___, 2013 WL 444764, *10 (S.D.N.Y. Feb. 5, 2013) (quoting *Wurie* and stating, "given the unique and significant information-storing capabilities of the modern cell phone, [defendant] did have a privacy interest in the cell phone that the NYPD officers found in his pocket" when they arrested him); *People v. Taylor*, 296 P.3d 317, 321 (Colo. App. 2012) (quoting *Wurie* and "assuming" that the defendant "had a reasonable expectation of privacy in his cellular telephone's call history"); *see generally Schlossberg v. Solesbee*, 844 F. Supp.2d 1165, 1170 (D. Or. 2012) ("[P]ersonal electronic devices such as cameras and cell phones cannot be considered closed containers" as "these devices are capable of holding large volumes of private information . . . . On a daily basis citizens may carry with them digital cameras, smart phones, ipads (or other tablets) and laptops. These devices often include some combination of email services and internet browsing. Potential information stored on them includes: phonebook information, appointment calendars, text messages, call logs, photographs, audio and video recordings, web browsing history, electronic documents and user location information. Wayne Jansen & Rick Ayers, Nat'l Inst. of Standards and Tech., Guidelines on Cell Phone Forensics 56 (2007), available at http:// csrc. nist. gov/ publications/ nistpubs/ 800–



as reasonable and legitimate.[17]

A person's subjective expectation of privacy in a cell phone that he owns and possesses is supported by decades of cases on "standing."[18]  A defendant normally has "standing" to challenge the search of places and objects that he owns.  For example, a homeowner has standing to challenge a search of his home.[19]  And a person generally has

---

101/ SP 800– 101. pdf.").

[17] *See, e.g., United States v. Finley*, 477 F.3d 250, 259 (5th Cir. 2007) (rejecting government's position that because cell phone belonged to his employer, defendant did not have standing to challenge search of cell phone; defendant had use of phone and took normal precautions to protect privacy of phone calls and records even though he did not have password protection); *United States v. Lopez-Cruz*, 730 F.3d 803, 808-09 (9th Cir. 2013) (upholding trial judge's finding that defendant who was in possession of cell phones and was using them had a reasonable expectation of privacy in them; no evidence that defendant did not legitimately possess the phones or that he failed to take normal precautions to maintain privacy by abandoning them or throwing them away when he was stopped by agents); *United States v. Quintana,* 594 F. Supp.2d 1291, 1299 (M.D. Fla. 2009) ("An owner of a cell phone generally has a reasonable expectation of privacy in the electronic data stored on the phone."); *State v. Carroll*, 778 N.W.2d 1, 10-11 (Wis. 2010) (defendant had a reasonable expectation of privacy in his cell phone); *United States v. Davis*, 787 F. Supp.2d 1165, 1170 (D. Or. 2011) (finding "[a] person has a reasonable expectation of privacy in his or her personal cell phone, including call records and text messages"); *United States v. Gomez*, 807 F. Supp.2d 1134, 1141 (S.D. Fla. 2011) (defendant had a reasonable expectation of privacy in his cell phone).

[18] When asked at oral argument about specific evidence that Mr. Granville had a subjective expectation of privacy in his cell phone, defense counsel recalled his law-school memory of *res ipsa loquitur*, the notion that "the thing speaks for itself." It was, after all, a cell phone.  Just as one assumes that a person has a subjective privacy interest in his diary, in his medical records, in his bank records, in the content of his telephone calls, and in the content of his personal computer, one may assume, without further proof, that a person has a subjective privacy interest in his cell phone.

[19] *Alderman v. United States*, 394 U.S. 165, 176-80 (1969) (a person's property interest in his own home was so great as to allow him to object to electronic surveillance of conversations emanating from his home, even though he himself was not a party to the conversations).

standing to challenge the search or seizure of a car he owns.[20]

A "legitimate" expectation of privacy acknowledges the lawfulness of the person's

"subjective" expectation of privacy. As the Supreme Court has explained,

> a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence . . . is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.' " And it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, . . . and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.[21]

The factors that courts use in deciding whether a person has a reasonable expectation of

privacy in the place or object searched include the following:

(1)    whether the defendant had a proprietary or possessory interest in the place or object searched.[22]

---

[20] *United States v. Jones*, 132 S.Ct. 945, 950-53 (2012) (trespass upon car by placing GPS device on its underbelly was an invasion of property rights and constituted a Fourth Amendment search).

[21] *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (citations omitted).

[22] In a supplemental brief, the SPA argues that the recent decisions in *United States v. Jones*, 132 S.Ct. 945 (2012) and *Florida v. Jardines*, 133 S.Ct. 1409 (2013) superceded the *Katz* "expectation of privacy" model with the former common-law Fourth Amendment jurisprudence based on property law. The SPA suggests that these two views of the Fourth Amendment are mutually exclusive, but the Supreme Court has stated that they are complementary, not incompatible. *Jones*, 132 S.Ct. at 952 (stating that "the *Katz* reasonable-expectation-of-privacy test [was] *added*

(2)    whether the defendant's presence in or on the place searched was legitimate;

(3)    whether the defendant had a right to exclude others from the place or object;

(4)    whether the defendant took normal precautions, prior to the search, which are customarily taken to protect privacy in the place or object;

(5)    whether the place or object searched was put to a private use;

(6)    whether the defendant's claim of privacy is consistent with historical notion of privacy.[23]

Ownership or legal possession of the property searched is not the "be-all-end-all" in deciding whether a person has a legitimate expectation of privacy in it. But courts commonly find that a person has a legitimate expectation of privacy in the contents of his cell phone because of its "ability to store large amounts of private data" both in the cell phone itself and by

---

to, not *substituted* for, the common-law trespassory test."). The federal courts that have addressed the issue have agreed with this understanding. *See, e.g., United States v. Thomas*, 726 F.3d 1086, 1092 (9th Cir. 2013) (Fourth Amendment violation may arise under both the *Jones* common-law trespassory test or the *Katz* reasonable-expectation-of-privacy test); *United States v. Jackson*, 728 F.3d 367, 374 (4th Cir. 2013) ("The *Jardines* analysis does not end the Fourth Amendment inquiry, however, because, as *Jardines* itself makes clear, 'property rights are not the sole measure of Fourth Amendment violations' and '[t]he *Katz* reasonable-expectations test has been *added to* . . . the traditional property-based understanding of the Fourth Amendment.'") (quoting *Jardines*, 133 S.Ct. 1414, 1417).

[23] *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002); *see also United States v. Cardoza-Hinojosa*, 140 F.3d 610, 615 (5th Cir. 1998) (assessing a defendant's reasonable expectation of privacy by considering whether he has a property or "'possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place, whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy[,] and whether he was legitimately on the premises'") (quoting *United States v. Ibarra*, 948 F.2d 903, 906 (5th Cir. 1991)).

accessing remote services.[24] This data may involve the most intimate details of a person's

individual life, including text messages, emails, banking, medical, or credit card information,

pictures, and videos.[25] A cell phone is unlike other containers as it can receive, store, and

transmit an almost unlimited amount of private information.[26] The potential for invasion of

---

[24] *State v. Smith*, 920 N.E.2d 949, 955 (Ohio 2009) ("Although cell phones cannot be equated with laptop computers, their ability to store large amounts of private data gives their users a reasonable and justifiable expectation of a higher level of privacy in the information they contain. Once the cell phone is in police custody, the state has satisfied its immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost nor erased. But because a person has a high expectation of privacy in a cell phone's contents, police must then obtain a warrant before intruding into the phone's contents."); *United States v. Gomez*, 807 F. Supp.2d 1134, 1140-41 (S.D. Fla. 2011) (defendant had standing to contest search of his cell phone and a reasonable expectation of privacy in its text messages).

[25] *See United States v. Wurie*, 728 F.3d 1, 9 (1st Cir. 2013), *cert. granted*, 82 U.S.L.W. 3104 (U.S. Jan. 17, 2014) (No. 13-212) (the contents of cell phones are, "by and large, of a highly personal nature: photographs, videos, written and audio messages (text, email, and voicemail), contacts, calendar appointments, web search and browsing history, purchases, and financial and medical records. . . . Indeed, modern cell phones provide direct access to the home in a more literal way as well; iPhones can now connect their owners directly to a home computer's webcam, via an application called iCam, so that users can monitor the inside of their homes remotely. 'At the touch of a button a cell phone search becomes a house search, and that is not a search of a "container" in any normal sense of that word, though a house contains data.'") (citations omitted).

[26] *See United States v. Flores-Lopez*, 670 F.3d 803, 805 (7th Cir. 2012) ("A modern cell phone is in one aspect a diary writ large. Even when used primarily for business it is quite likely to contain, or provide ready access to, a vast body of personal data. The potential invasion of privacy in a search of a cell phone is greater than in a search of a 'container' in a conventional sense even when the conventional container is a purse that contains an address book (itself a container) and photos. Judges are becoming aware that a computer (and remember that a modern cell phone is a computer) is not just another purse or address book."); *see also*, Maeve Duggan & Lee Rainie, Pew Research Ctr.'s Internet & Am. Life Project, Cell Phone Activities 2012, at 2 (2012), available at http://pewinternet.org/~/media//Files/Reports/2012/PIP_CellActivities_11.25.pdf (noting that 29% of cell phone owners use their phones for online banking, and 31% access medical information); Elizabeth Woyke, *Debate Over Warrantless Cellphone Searches Heats Up*, FORBES (Sept. 7, 2011), available at http://www.forbes.com/sites/elizabethwoyke/2011/09/07/debate-over-warrantless cellphone-searches-heatsup/ (allowing such warrantless searches would expose sensitive information commonly stored on businesspersons' cell phones to governmental view).

privacy, identity theft, or, at a minimum, public embarrassment is enormous.[27]

**B.    An Arrestee Normally Has an Expectation of Privacy in the Contents of his Cell Phone That Is Being Temporarily Stored in a Jail Property Room.**

Although a person may have a reasonable and legitimate expectation of privacy in the contents of his cell phone, he may lose that expectation under some circumstances, such as if he abandons his cell phone,[28] lends it to others to use, or gives his consent to its search.[29] Courts across the country have wrestled with questions of when he might lose his reasonable expectation of privacy in other situations, perhaps if he is arrested and police perform a search of his cell phone incident to arrest[30] or, as here, of his cell phone stored in the jail

---

[27] *See, e.g., Newhard v. Borders*, 649 F. Supp.2d 440, 443-44 (W.D. Va. 2009) (former school teacher and his girlfriend sued police for invasion of privacy when defendant was arrested for DUI, officers took cell phone that his girlfriend had lent him, accessed nude photographs of himself and girlfriend in compromising positions, then shared photographs with other officers, which led to public notoriety and loss of his teaching position).

[28] *See United States v. Powell*, 732 F.3d 361, 374-75 (5th Cir. 2013) (when defendant-passenger disclaimed any personal connection to cell phone found in car, she lacked standing to contest its warrantless search by police officer); *compare United States v. Lopez-Cruz*, 730 F.3d 803, 808-09 (9th Cir. 2013) (arrestee did not abandon his privacy interest in cell phones when he denied ownership of them and said they belonged to a friend because he was in possession of them and using them when he was stopped by border-patrol agent).

[29] *See Lopez-Cruz*, 730 F.3d at 809-11 (defendant consented for border patrol agent to "look through" his cell phone, but scope of that consent did not include answering incoming calls).

[30] Because the State did not rely upon the "search incident to arrest" doctrine in the trial court, the court of appeals did not address that doctrine in its opinion. We will not do so either, but we do note that two separate certiorari petitions have been granted by the United States Supreme Court on the issue of whether the cell phone of an arrestee may be searched without a warrant under the "search incident to arrest" doctrine. *Riley v. California*, 82 U.S.L.W. 3082 (U.S. Jan. 17, 2014) (No. 13-132); *United States v. Wurie*, 82 U.S.L.W. 3104 (U.S. Jan. 17, 2014) (No. 13-212). The legal issue in the present case is similar to, but not the same as, that in *Riley* and *Wurie* which came to opposite conclusions; the California court of appeals upheld the warrantless search as incident to an arrest, while the First Circuit held that such a warrantless search violated the Fourth Amendment.

property room.

Under the Fourth Amendment, police officers may search an arrestee incident to a lawful arrest.[31] The justification for permitting such a warrantless search is (1) the need for

---

Courts across the nation are split on this issue. *Compare Smallwood v. State*, 113 So. 3d 724, 735-38 (Fla. 2013) (condemning warrantless search of cell phone as part of a search incident to arrest); *State v. Smith*, 920 N.E.2d 949, 956 (Ohio 2009) (same), *cert. denied*, 131 S. Ct.102 (2010), *with United States v. Murphy*, 552 F.3d 405, 411-12 (4th Cir. 2009) (need to preserve evidence justified officers' warrantless retrieval of call records and text messages from cell phone of suspected narcotics arrestee), *cert. denied*, 129 S. Ct. 2016 (2009); *United States v.Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007) (although arrestee has a reasonable expectation of privacy in his cell phone and thus had standing to complain about search, warrantless search of cell phone was permissible as incident to arrest).

Even if the State had relied upon the "search incident to arrest" doctrine in this case, we note that the majority of recent cases that have considered the issue in the context of a cell-phone search have held that the search must be contemporaneous (or nearly so) to the arrest itself. *See, e.g., Murphy*, 552 F.3d at 411 (initial search of cell phone occurred when arrestee handed phone to arresting officer); *United States v. Santillan*, 571 F.Supp.2d 1093, 1102 (D. Ariz. 2008) (search of cell phone occurred "mere minutes after the arrest and seizure"); *United States v. Curry*, No. 07–100, 2008 WL 219966, *10 (D. Me. Jan.23, 2008) (not designated for publication) (search of cell phone was "substantially contemporaneous" with arrest). Some courts have held that cell-phone searches that were not closely contemporaneous were not made incident to arrest. *See, e.g., United States v. Gibson*, 2012 WL 1123146, *10 (N.D. Cal. April 3, 2012) (not designated for publication) (search of cell phone was not incident to arrest when search took place approximately one to two hours after arrest); *United States v. Lasalle*, 2007 WL 1390820, *7 (D. Hawaii May 9, 2007) (not designated for publication) (search of cell phone was not incident to arrest where search was conducted "somewhere between two hours and fifteen minutes to three hours and forty-five minutes" after arrest); *United States v. Park*, 2007 WL 1521573, *7 (N.D. Cal. May 23, 2007) (not designated for publication) (search of cell phone was not incident to arrest when search took place ninety minutes after arrest); *see also United States v. Chadwick*, 433 U.S. 1, 15 (1977) (concluding that search of locked trunk ninety minutes after an arrest was too remote in time and place to be incident to the arrest); *see generally*, Jana L. Knott, *Is There an App For That? Reexamining the Doctrine of Search Incident to Lawful Arrest in the Context of Cell Phones*, 35 OKLA. CITY L. REV. 445, 445-47 (2010).

[31] *United States v. Robinson*, 414 U.S. 218, 224-26 (1973) (citing *Chimel v. California*, 395 U.S. 752, 762-63 (1969) (officer who had made full-custody arrest for driving a car without a permit could conduct warrantless search of person as part of that arrest; when officer found crumpled cigarette pack in arrestee's pocket, he could seize the heroin capsules that he found within that pack).

officers to seize weapons or other things which might be used to assault on officer or effect

an escape, and (2) the need to prevent the loss or destruction of evidence.[32]  A search is

incident to arrest only if it is "substantially contemporaneous" with the arrest and is confined

to the area within the immediate control of the arrestee.[33]  Thus, a search incident to arrest

cannot normally be justified if the "'search is remote in time or place from the arrest' . . . or

no exigency exists."[34]

In *United States v. Edwards*,[35] the Supreme Court recognized an exception to the

"substantially contemporaneous" search-incident-to-arrest doctrine and upheld a warrantless

search of an arrestee's clothes at the police station ten hours after the arrest.[36]  In *Edwards*,

the police took the arrestee's clothes to look for evidence of paint chips that would match

samples that had been taken from the window of the post office during the attempted

burglary.[37]  The police waited these ten hours because "it was late at night" and they had no

---

[32] *Id.*

[33] *Vale v. Louisiana*, 399 U.S. 30, 33 (1970).

[34] *United States v. Chadwick*, 433 U.S. 1, 15 (1977); *see also Schlossberg v. Solesbee*, 844 F. Supp.2d 1163, 1167-71 (D. Or. 2012) (declining to distinguish between electronic devices such as cell phones, digital cameras, and laptops, and holding that a warrantless search of the contents of a digital camera as a search incident to arrest violated the Fourth Amendment); *United States v. LaSalle*, No. 07-00032 SOM, 2007 WL 1390820, *7 (D. Hawaii May 9, 2007) (not designated for publication) (because police officer did not search cell phone contemporaneously with defendant's arrest, the "search incident to arrest" doctrine did not apply; motion to suppress granted).

[35] 415 U.S. 800 (1974).

[36] *Id.* at 805.

[37] *Id.* at 801-02.

other clothes for Edwards to wear; "it would certainly have been unreasonable for the police to have stripped [Edwards] of his clothing and left him exposed in his cell throughout the night."[38] The Court cautioned, however, that in upholding this particular search and seizure of an arrestee's clothing, it had "not conclud[ed] that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee."[39]

We relied upon the *Edwards* ruling and rationale in *Oles v. State*,[40] in holding that the warrantless search of an arrestee's clothing was not unlawful because the defendant failed to establish a subjective and reasonable expectation of privacy in the clothing he wore when arrested and that had been placed in the jail property room.[41] We explained that "arrestees do retain some level of privacy interest in the personal effects or belongings taken from them incident to their arrest,"[42] but that there is a lesser subjective expectation of privacy and a

---

[38] *Id.* at 805.

[39] *Id.* at 808; *see id.* at n.9 ("Holding the Warrant Clause inapplicable *in the circumstances present here* does not leave law enforcement officials subject to no restraints.") (emphasis added).

[40] 993 S.W.2d 103 (Tex. Crim. App. 1999). We noted the distinctions between the situation in *Oles* and that in *Edwards*, including the facts that (1) Oles's clothes didn't show any obvious signs of blood, whereas the clothes in *Edwards* were "blood-spattered"; (2) Oles's clothes were taken eight days after his arrest, whereas the police took Edwards's clothes just ten hours after his arrest; (3) there was clear probable cause to search Edwards's clothing, whereas there was not probable cause to believe that Oles's clothes contained bloodstain evidence relevant to the murder until the clothes had actually been tested. Based upon those distinction, we concluded that "although *Edwards* and *Marquez* [*v. State*, 725 S.W.2d 217 (Tex. Crim. App. 1987)] provide the foundation for today's ruling, clearly they are not dispositive of the issues presented in the instant case." *Id.* at 107-08.

[41] *Id.* at 108-11.

[42] *Id.* at 108.

lesser societal expectation of privacy in inventoried property.[43] Of course, there is a vast difference between the privacy interests and expectations in clothing that one is wearing when arrested and certain other possessions that one might have with them.

Indeed, just a few years after deciding *Edwards*, the Supreme Court addressed the scenario of a 200-pound footlocker that had been seized when the defendant was arrested leaving a train station, but that was not searched until 90 minutes later and was no longer in the arrestee's possession.[44] The Court held that the evidence obtained from that search must be suppressed because the footlocker "was property not immediately associated with the arrestee" at the time of the search.

> [O]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer incident to the arrest.[45]

In such circumstances, the police may legitimately "seize" the property and hold it while they seek a search warrant.[46] But they may not embark upon a general, evidence-gathering search,

---

[43] *Id.* at 109-10.

[44] *United States v. Chadwick*, 433 U.S. 1, 4 (1977), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991); *see United States v. Jhan*, 74 F.3d 537, 542 n.2 (4th Cir. 1996) (*Chadwick* has been overruled only as to closed containers seized from inside an automobile).

[45] *Chadwick*, 433 U.S. at 15. *See also Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring) ("When officer safety or imminent evidence concealment or destruction is at issue, officers should not have to make fine judgments in the heat of the moment. But in the context of a general evidence-gathering search, the state interests that might justify any overbreadth are far less compelling.").

[46] *Chadwick*, 433 U.S. at 13.

especially of a cell phone which contains "much more personal information . . . than could ever fit in a wallet, address book, briefcase, or any of the other traditional containers that the government has invoked."[47]

With that general background, we turn to the present case.

## III.

In this case, the court of appeals summarized its holding and reasoning as follows:

> Due to the potential invasiveness of the search, Granville's status as a pretrial detainee, the fact that his stay in jail for a class C misdemeanor would be of short duration, the utter lack of any nexus between the cell phone and the crime for which appellant was jailed, and the lack of evidence suggesting that the phone and its contents posed any risk to the jail's penalogical interest, we conclude that society would recognize his continued, and reasonable, privacy interest in the instrument despite his temporary detention.[48]

The SPA argues that the court of appeals erred because an arrestee "has no legitimate expectation of privacy in the personal effects immediately associated with his person at the time of lawful arrest."[49] In the SPA's view, *Oles* was "incorrect to hold that expectations of privacy in jail are only diminished–rather than nonexistent–and the court of appeals'[s] decision results directly from that holding and the unnecessary analysis performed to decide

---

[47] *United States v. Wurie*, 728 F.3d 1, 9 (1st Cir. 2013) ("Just as customs officers in the early colonies could use writs of assistance to rummage through homes and warehouses, without any showing of probable cause linked to a particular place or item sought, the government's proposed rule would give law enforcement automatic access to 'a virtual warehouse' of an individual's 'most intimate communications and photographs without probable cause' if the individual is subject to a custodial arrest, even for something as minor as a traffic violation.").

[48] *Granville*, 373 S.W.3d at 225.

[49] SPA's Brief at 3.

that case."[50] According to the SPA, when a citizen is arrested for any offense, such as failing to wear a seat belt,[51] verything that the person possessed at the time of that arrest—purse, briefcase, laptop computer, cell phone, medical records, IRS returns, trade secret information—is subject to a warrantless search because all of that citizen's privacy interests have completely disappeared. We cannot agree with this reasoning.

First, the SPA fails to distinguish between a search incident to arrest and a search of an arrestee's personal property that has already been inventoried and placed in storage. As the Supreme Court recently explained in *Arizona v. Gant*,[52] the search incident to an arrest exception to the warrant requirement is premised upon promoting officer safety and preventing the destruction of evidence relating to the crime for which the person was arrested.[53] Although *Gant* involved the search of a car, courts have discussed its application to other situations in which "the item searched is removed from the suspect's control between

---

[50] *Id.* at 3-4.

[51] *See, e.g., Atwater v. Lago Vista*, 532 U.S. 318, 354-55 (2001) (officers could arrest and jail mother who, along with her children, was not wearing a seat belt in her truck; officers at jail made her remove her shoes, jewelry, and eyeglasses, and detained her in a jail cell).

[52] 556 U.S. 332 (2009).

[53] *Id.* at 351. In *Gant*, police officers arrested the defendant for driving with a suspended license, handcuffed him, and locked him in the back of a patrol car. *Id.* at 335. Then the police searched his car and found cocaine in the pocket of a jacket that had been lying in the back seat. The Supreme Court held that this search was unlawful under the "search incident to arrest" exception because, under that exception, officers may search the passenger compartment of a car "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or if it is reasonable to believe that the vehicle contains evidence of the offense of arrest." *Id.* at 351.

the time of his arrest and the time of the search."[54] Some courts have applied *Gant* in

rejecting the lawfulness of a search of the contents of an arrestee's cell phone.[55]

---

[54] *United States v. Shakir*, 616 F.3d 315, 318 (3d Cir. 2010) (applying *Gant* to search of a gym bag that was lying at arrestee's feet when he was arrested and handcuffed; upholding search because defendant was still close to gym bag, was not fully secure, and handcuffs are not fail-safe in preventing dangerous acts by an arrestee); *see also United States v. Perdoma*, 621 F.3d 745, 750-52 (8th Cir. 2010) (applying *Gant* principles to search incident to arrest in bus terminal).

[55] *See United States v. Wurie*, 728 F.3d 1, 3 (1st Cir. 2013), *cert. granted*, 82 U.S.L.W. 3104 (U.S. Jan. 17, 2014) (No. 13-212) (citing *Gant* and holding that "the search-incident-to-arrest exception does not authorize the warrantless search of data on a cell phone seized from an arrestee's person, because the government has not convinced us that such a search is ever necessary to protect arresting officers or preserve destructible evidence."); *United States v. DiMarco*, No. 12 CR 205 (RPP), 2013 WL 444764, *8 & 11-12 (S.D.N.Y. Feb. 5, 2013) (not designated for publication) (citing *Gant* and concluding that warrantless search of arrestee's cell phone more than six hours after defendant's arrest was unlawful; "delayed search" was not incident to arrest nor supported by the officer-safety and evidence-protection justifications of that exception); *United States v. Dixon*, ___ F. Supp.2d ___, 2013 WL 6055396, *3 (N.D. Ga. 2013) (citing *Gant* and concluding that agent's action of taking arrestee's cell phone back to his office and searching it was not a search incident to arrest and was unlawful; motion to suppress granted); *United States v. Brown*, No. 12-79-KKC, 2013 WL 1185223, *3 (E.D. Ky. March 20, 2013) (not designated for publication) (citing *Gant* and upholding initial, brief search of cell phone that was immediately incident to arrest because defendant was "manipulating" cell phone at time officers ordered him out of truck; defendant could have been warning confederate to escape or requesting assistance from him, or he could have been destroying evidence on cell phone; but once officers determined that "no helpful information was readily available" on arrestee's phone, officers should have ceased search of phone's "contact list" and sought a warrant); *Anthony v. Oliva*, No. ED CV 12-1369-FMO, 2013 WL 1127104, *6-7 (C.D. Cal. Jan. 29, 2013) (not designated for publication) (citing *Gant* and holding that civil-rights plaintiff had pled a cause of action against police department when officers allegedly went beyond legitimate purpose of search incident to arrest and began to "look" and "navigate" through cell phone); *State v. Cooper*, No. 66-CR-11-2228, 2013 WL 264430, *5 (Minn. Ct. App. Jan. 14, 2013) (not designated for publication) (citing *Gant* and upholding trial court's suppression of search of cell phone made long after officer had seized it from arrestee, who could not have retrieved it); *see also State v. Smith*, 920 N.E.2d 949, 955 (Ohio 2009) (noting, in a case involving the warrantless search of an arrestee's cell phone incident to arrest, that: "Once the cell phone is in police custody, the state has satisfied its immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost nor erased. But because a person has a high expectation of privacy in a cell phone's contents, police must then obtain a warrant before intruding into the phone's contents.").

Second, the SPA makes the false analogy that, if a jail detainee does not have any

privacy rights in his jail *cell*,[56] he therefore does not have any privacy rights in his personal

property that is being safeguarded in the jail property room.  The assumption that prisoners

or pretrial detainees are without any Fourth Amendment rights is not supported by the

Supreme Court.  As a unanimous Court noted in 1974:

> Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a "retraction justified by the considerations underlying our penal system.". . . But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.[57]

*Oles* correctly held that jail detainees enjoy a diminished expectation of privacy, not that a

detainee has absolutely no reasonable expectation of privacy.[58]  Furthermore, the security

---

[56] *See Hudson v. Palmer*, 468 U.S. 517, 527-36 (1973) (holding "that the Fourth Amendment has no applicability to a prison cell" because of the needs of institutional security; "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continued surveillance of inmates and their cells required to ensure institutional security and internal order.").

[57] *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974) (citation omitted).

[58] *Oles*, 993 S.W.2d at 108; *see Bell v. Wolfish*, 441 U.S. 520, 556-57 (1979) ("It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person. . . . In any case, given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope. Assuming, *arguendo*, that a pretrial detainee retains such a diminished expectation of privacy after commitment to a custodial facility, we nonetheless find that the room-search rule does not violate the Fourth Amendment."); *see also United States v. Cohen*, 796 F.2d 20, 23-24 (2d Cir. 1986) (detainee "retains an expectation of privacy within his cell sufficient to challenge the investigatory search ordered by the prosecutor" to get evidence to aid them "in laying additional indictments against a detainee"; search was unrelated to jail-security concerns); *Lowe v. State*, 416 S.E.2d 750, 752 (Ga. Ct. App. 1999) (pretrial detainee had reasonable expectation of privacy in papers in his cell containing his

rationale and "needs of the institution" that underpin the diminished expectation of privacy in a jail cell is not equally applicable to property that jailers have already inventoried and are safeguarding in the property room.[59]

Third, the SPA contends that, under *Oles*, any search of any property in the custody of jail officials is permissible. We disagree with that absolutist position and agree with the court of appeals that the object of the search makes all the difference between this situation and that in *Oles*.[60] There, the police seized and tested a pair of pants and shoes for blood. We noted that the first question was "whether an arrestee retains any expectation of privacy in clothing lawfully taken and inventoried by police incident to an arrest."[61] After analyzing various precedent, we concluded that "arrestees do retain some level of privacy interest in the personal effects or belongings taken from them incident to their arrest," but that

---

handwriting because search was unrelated to needs of jail and was an attempt to find evidence to bolster State's case); *State v. Neely*, 462 N.W.2d 105, 112 (Neb. 1990) (pretrial detainee retained reasonable expectation of privacy in her luggage while it remained in the jail's locked inventory).

[59] *See, e.g., Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) (as part of routine procedure incident to jailing an arrested person, officers may "search any container or article in [police] possession, in accordance with established inventory procedures."; emphasizing that inventory search must be conducted pursuant to established procedures); *Florida v. Wells*, 495 U.S. 1, 4 (1990) (inventory searches must be conducted pursuant to established inventory procedures, so that they do not become "a ruse for a general rummaging in order to discover incriminating evidence.").

[60] In *Oles*, the defendant was initially detained at the police station as a witness to a murder. When officers discovered that he had an outstanding felony warrant, they arrested him, then inventoried and stored his clothing. Eight days later, while the defendant was still in jail, an investigator took his clothing to the medical examiner if see if he could find any blood. A serologist discovered blood on the defendant's shoes that matched the victim's blood. 993 S.W.2d at 105.

[61] *Id.* at 106.

> [r]eviewing this search under a totality of the circumstances, there is virtually no evidence that [defendant] harbored a subjective expectation of privacy in his clothing that was in the custody of the police, nor is there evidence that society would deem such a belief reasonable under these circumstances. [Defendant] has failed to meet his burden of proof in establishing a legitimate expectation of privacy in his clothing.[62]

That is the general doctrine concerning privacy interests in clothing, but clothing does not contain private banking or medical information and records; it does not contain highly personal emails, texts, photographs, videos, or access to a wide variety of other data about the individual citizen, his friends and family. Searching a person's cell phone is like searching his home desk, computer, bank vault, and medicine cabinet all at once. There is no doubt that the Fourth Amendment protects the subjective and reasonable privacy interest of citizens in their homes and in their personal "papers and effects." Conversely, clothing, like the shoes seized and tested in *Oles*, is displayed every time a citizen walks out into the world. As now-Presiding Judge Keller noted in her concurrence in *Oles*,

> The outside of a person's shoes while being worn are constantly exposed to the public. When [the defendant] was arrested and incarcerated, the police obtained lawful possession of his shoes. Given that the outside of the shoes

---

[62] *Id.* at 110-11. In *Oles*, we did not state, or even suggest, that a defendant would never have a reasonable expectation of privacy in *any* item that was in the custody of the police. Suppose, for example, that the officer in *Oles* had taken a sealed personal letter out of the defendant's clothes, opened it, and read it. At least one court has said that the Fourth Amendment would not permit that officer to open and read someone's else's mail without a warrant. *See United States v. Wall*, No. 08-60016-CR, 2008 WL 5381412, *3 (S.D. Fla. 2008) (not designated for publication) (warrantless search of cell phone made during jail booking was improper; stating that "searching through information stored on a cell phone is analogous to a search of a sealed letter, which requires a warrant.") (citing *United States v. Jacobson*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless search of such effects are presumptively unreasonable.").

are constantly exposed to the public, appellant could not have a reasonable expectation of privacy against a visual inspection of the shoes, on the outside, with the naked eye.[63]

Similarly, here, the officers could have reasonably inspected the outside of appellant's cell phone; they could have tested it for fingerprints or DNA material because portions of the cell phone are routinely exposed to the public. But we do not think that a citizen, including appellant, has lost his expectation of privacy in the contents of his cell phone merely because he has been arrested and his cell phone is in the custody of police for safekeeping.

Although some courts have held that a person does not have a reasonable expectation of privacy in the contents of his cell phone when he is subjected to a search incident to arrest,[64] citizens themselves have become increasingly concerned about privacy expectations

---

[63] *Oles*, 993 S.W.2d at 111 (Keller, J., concurring). Judge Keller went on to note that, because the police could also legitimately handle and store the shoes, "even the inside of the shoes would be exposed to the officers," so that the defendant did not have a reasonable expectation of privacy in either the inside or outside of the shoes. *Id.*

[64] *See, e.g., United States v. Flores-Lopez*, 670 F.3d 803, 810 (7th Cir. 2012) (upholding search incident to arrest of cell phone to obtain its phone number but questioning whether a more invasive search would be permissible); *United States v. Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007) (stating that a cell phone is just another "container" and upholding its search as incident to arrest); *People v. Diaz*, 244 P.3d 501, 506-08 (Cal. 2011) (upholding search of cell phone 90 minutes after the arrest of narcotics defendant; concluding that a search of an item "immediately associated with the person" at the time of arrest is valid because of "reduced expectations of privacy caused by the arrest," not the nature of the item seized). In *Diaz*, the court recognized that it was contributing to a deepening split between state and federal courts on whether a person has a reasonable expectation of privacy in the contents of his cell phone, but left it to the United States Supreme Court to decide if modern technology makes a difference to the traditional ability to search the contents of containers as part of an otherwise legitimate search incident to arrest.

The citizens of California disagreed with the California Supreme Court's holding, and the California Legislature promptly passed a bill requiring police to obtain a search warrant before searching the contents of any "'portable electronic devices,' including cell phones." Supplemental Brief in Opposition, *Diaz v. California*, 132 S.Ct. 94 (2011) (No. 10-1231), 2011 WL 4366007, at

and their cell phones,[65] even before the current NSA phone controversy.[66]

---

*1(describing Senate Bill 914 (2011)).   After the state's attorneys brought that legislation to the attention of the United States Supreme Court and urged the Court to deny *Diaz's* writ of certiorari, the Court did so, and, one week later, California's governor vetoed the "cell phone privacy" bill, stating that the "courts are better suited to resolve the complex and case-specific issues relating to constitutional search-and-seizures protections." Letter from Edmund G. Brown Jr., Governor, to Members of the California State Senate (Oct. 9, 2011), available at http://www.leginfo.ca.gov/pub/11-12/bill/sen/sb_0901-0950/sb_914_vt_20111009.html. *See also* Petition for Certiorari at 6, *Riley v. California*, No. 13-132, available at http://www.volokh.com/wp-content/uploads/ 2013/08/Riley-cert-petition-final-1.pdf.

[65] *See, e.g., United States v. Wurie, 728 F.3d 1, 8 (1st Cir. 2013)*, *cert. granted* 82 U.S.L.W. 3104 (U.S. Jan. 17, 2014) (No. 13-212) (quoting Maeve Duggan & Lee Rainie, Pew Internet and American Life Project, *Privacy and Data Management on Mobile Devices* (Sept. 5, 2012)) (publishing poll survey results that "[m]ore than half of mobile app users have uninstalled or avoided cell phone apps because of privacy concerns," and "[n]early one third of cell owners have experienced a lost or stolen phone, and 12% have had another person access the contents of their phone in a way that made them feel their privacy was invaded"; "[t]he rise of the smartphone has dramatically altered the relationship between cell owners and their phones when it comes to monitoring and safeguarding their personal information," said Aaron Smith, a Research Associate with the Project and report co-author. "The wealth of intimate details stored on smartphones makes them akin to the personal diaries of the past—the information they contain is hard to replace if lost, and potentially embarrassing in the wrong hands."), available at http://www.pewinternet.org/Press-Releases/2012/Mobile-Privacy.aspx.

[66] *Compare Klayman v. Obama*, ___ F.Supp.2d ___, 2013 WL 6571596, * 20 (D.D.C. Dec. 16, 2013) (citing numerous internet data compilations concerning the ubiquity of cell phones and other technological devices and noting, "Put simply, people in 2013 have an entirely different relationship with phones than they did thirty-four years ago. As a result, people make calls and send text messages now that they would not (really, *could not* ) have made or sent back when" earlier search and seizure cases were decided).  Judge Leon explained, "Records that once would have revealed a few scattered tiles of information about a person now reveal an entire mosaic—a vibrant and constantly updating picture of the person's life.  Whereas some may assume that these cultural changes will force people to reconcile themselves to an inevitable diminution of privacy that new technology entails, I think it is more likely that these trends have resulted in a *greater* expectation of privacy and a recognition that society views that expectation as reasonable." *Id.* at 21 & n. 59 (noting, "Public opinion polls bear this out. *See, e.g.,* Associated Press, *9/11 Anniversary: Poll Finds Public Doubts Growing on Federal Surveillance, Privacy,* Hous. Chron., Sept. 11, 2013, at A6 ("Some 56 percent oppose the NSA's collection of telephone records for future investigations even though they do not include actual conversations.")), *with ACLU v. Clapper*, ___ F. Supp.2d ___, 2013 WL 6819708 *20-22 (S.D.N.Y. Dec. 27, 2013) (NSA's collection of "bulk telephony metadata" did not violate Fourth Amendment principles; "Some ponder the ubiquity of cellular telephones and how

In sum, we conclude, as did the court of appeals, that a cell phone is not like a pair of pants or a shoe. Given modern technology and the incredible amount of personal information stored and accessible on a cell phone, we hold that a citizen does not lose his reasonable expectation of privacy in the contents of his cell phone merely because that cell phone is being stored in a jail property room. Officer Harrell could have seized appellant's phone and held it while he sought a search warrant, but, even with probable cause, he could not "activate and search the contents of an inventoried cellular phone" without one. We answer "No" the SPA's sole question for review, and we affirm the judgment of the court of appeals.

Delivered: February 26, 2014
Publish

---

subscribers' relationships with their telephones have evolved since *Smith*. While people may 'have an entirely different relationship with telephones than they did thirty-four years ago,' this Court observes that their relationship with their telecommunications providers has not changed and is just as frustrating. Telephones have far more versatility now than when *Smith* was decided, but this case only concerns their use as telephones. The fact that there are more calls placed does not undermine the Supreme Court's finding that a person has no subjective expectation of privacy in telephony metadata.") (citation to *Klayman* omitted).

"EXHIBIT C"
LOOK AT THE LAST
LINE MS. DONCIA WROTE

☑ COPY 4 pgs

Gilberto Gomez

Guillermo Valdez

972-333-4577

Gilberto Gomez
5-24-68
1440 Oaklawn Corsica
903-654-9100

Continuing

Sex Assault Minor
plead guilty stepdaughter
15 yoa
W+ stepdaughter
G/F 14

Videotaped statement
Det Cloud
Nanny

Marshall William
DET TENNET
Been to websites
porn
Verna

W tried to cause him to get help -
psychological
while in jail    > Mag. State Vick Gunn
He was abused - Told some guys - Now
he's scared

He's segregated - high risk

WOULD HAVE BEEN LESS if AGG %. on WHETHER JUDGE HAD POWER TO GIVE LESS
IF NOW AGG - HAVE TO DO 15

He wd

They told him Wife if no plea bargain
EXHIBIT 2

Cell phone - They took

Always @ night
3l no penetration

→ Tomorrow is grand jury

Wants to be able to see kids

He would like probation
Monitoring
or short-term — w/ protection

JUDGE COULD HAVE
GIVEN HIM

Father spanked him w/ belt

He has 2 BSs + Masters degree

Takes trazeldone
Seraquil

RECEIVED
JUN 2 5 2013
BY:................

LOOK AT (P. 5)
← ONE DAY
BEFORE SIGNING
SENTENCE

"EXHIBIT B"
LOOK BELOW
LEFT CORNER

6/21/2013

GOOD MORNING MS. KERRI ANDERSON,

I WANT TO TALK TO YOU ABOUT AN EVENT THAT HAPPENED THIS MORNING IN MY CELL. AN INMATE BY THE NAME OF NICOLA TOLL FOUGHT AN ELDERLY MAN BY THE NAME OF JIMMY HONEA, 58 YEARS OLD. HONEA GOT A PUNCTURED WOUND ON BOTH FINGER ← *BIT HIM ON BOTH FINGERS. MR HONEA IS GOING TO PRESS CHARGES FOR AGGRAVATED ASSAULT TO AN ELDERLY MAN. I WARNED SEVERAL TIMES TO SEVERAL OFFIC INCLUDING SGT. TYRON MARTIN ABOUT MR. TOLL'S BEHAVIOR HERE IN JAIL. MR TOLL HAS BEEN IN THIS PRISON CELL IN AND OUT AT LEAST 10 TIMES, WE WARNED THE OFFICERS AND THEY DON'T LISTEN TO US. HE KEPT ON BEING PUT BACK IN HERE, WHERE HE TOLD BELONGED IN A SINGLE CELL. HE HAS BEEN IN 10 FIGHTS AT LEAST IN THIS JAIL. HE WAS A THREAT TO OTHER INMATES, INCLUDIN MYSELF AND WAS STILL PUT BACK IN THIS TANK DESPITE ALL WARNINGS I GAVE THEM. MOREOVER, AS I HAVE BEEN LOCKED UP FOR ALMOST FIVE MONTHS I NOTICED THAT INMATES ALREADY KNOW WHAT MY CHARGES ARE BECAUSE OF THE GUARDS GOSSIP, TALKING OUT LOUD ABOUT PRISON INMATES. I WOULD LIKE TO DISCUSS THIS MATTER WITH YOU AS SOON AS POSSIBLE. I BELIEVE I AM NOT GONNA GET A FAIR TRIAL IN THIS COUNTY AND JAIL NEGLIGENCE. [] DID SHE DO ANYTHING?

I ALSO [] FEEL INTIMIDATED MY THE DETECTIVES

THANKING YOU IN ADVANCE,

GILBERTO GOMEZ

EXHIBIT D (BELOW & NEXT PAGE TOO)

- Mounting financial problems
- Inability to focus upon tasks at hand
- Slurred speech
- Lowered libido

Physical symptoms:

- Requiring more and greater amounts of Xanax to achieve the same pleasurable feelings
- Physical dependence upon the drug
- Withdrawal symptoms if Xanax is decreased or discontinued
- Excessive sleepiness
- Respiratory depression
- Swollen extremities
- Nausea and vomiting
- Blurred or double vision
- Dry mouth or throat
- Tremors
- Headaches

## Psychological symptoms:

- Paranoia
- Confusion
- Memory deficits
- Developing addiction to other substances
- Addiction
- Psychological dependence
- Hallucinations
- Delusions

If you feel that you are in crisis, or are having thoughts about hurting yourself or others, please call 9-1-1 or go to the nearest emergency room immediately.

# Effects of Xanax Abuse

The effects of long-term Xanax abuse will differ from person to person, but one thing is clear: addiction to Xanax leaves virtually no area of an addict's life unscathed. Some of the most common effects of Xanax abuse include:

- Crumbling interpersonal relationships
- Short-term memory impairment
- Social isolation
- Blurred or double vision
- Lack of muscle coordination
- Decreased libido
- Tremors
- Preoccupation with obtaining, using, and recovering from Xanax
- Job loss
- Financial ruin
- Legal problems
- Incarceration
- Increased respiratory infections
- Depression
- Chest pain
- Hyperactivity
- Suicidal thoughts

# Effects of Withdrawal

When an individual who has become physically and psychologically dependent upon Xanax attempts to stop using the drug, he or she will likely go through symptoms of withdrawal. Withdrawal from Xanax is something that should only be done under the supervision of a physician

as the effects of withdrawal can cause serious negative consequences. Most common effects of Xanax withdrawal include:

- Insomnia
- Tremors
- Nausea and vomiting
- "Brain fog"
- Increased anxiety
- Depression
- Suicidal thoughts and behaviors

GET CONFIDENTIAL HELP NOW:

# 888.919.5416

☐ *email us*

GET CONFIDENTIAL HELP NOW:

# 888.919.5416

☐ *email us*

© 2014 Park Royal Hospital, all rights reserved.

## Legal Links

, Privacy Practices
, Corporate Compliance

Park Royal hospital provides modern, compassionate treatment for adults and seniors suffering with mental health issues and co-occurring disorders.

## About

- About Park Royal
- Our Location
- Our Mission

## Programs

- Programs
- Adults
- Older Adults & Seniors
- Intensive Outpatient Therapy

## Admissions

- Admissions
- Professional Referrals
- Insurance & Payment Information

require drug rehab before embarking on a new, sober life.

GET CONFIDENTIAL HELP NOW:

# 888.919.5416

☐ email us

# Statistics

Addiction and abuse of Xanax is a rapidly growing problem in the United States. Between 2004 and 2010, the number of individuals who visited the emergency room suffering from Xanax effects nearly tripled. Of the 125,000 who visited the ER in 2010, over 96,000 had used more than one drug with Xanax – most often alcohol, marijuana, cocaine, or opiate narcotics.

In 2011, Treatment Episode Data Set Report discovered that 60,200 individuals who sought rehab were addicted to benzos such as Xanax; a wild increase from 1998 in which 22,400 individuals sought treatment for the same drug class.

# Co-Occurring Disorders

Addiction to Xanax rarely occurs in the absence of other mental illnesses. The most common co-occurring disorders include:

- Depressive disorders
- Anxiety disorders

Left Rail Menus –
Prescription Drugs

- Prescription Drugs
- Effects, Signs &
  Symptoms
- Xanax
- Effects, Signs &
  Symptoms
- Vicodin
- Effects, Signs &
  Symptoms
- Oxycodone
- Effects, Signs &
  Symptoms

Affiliations &
Recognition



Joint
Commission
Gold Seal of
Approval



The Jason
Foundation

# Xanax Abuse & Addiction Symptoms, Causes, Signs & Side Effects

## CONTENTS

- Statistics
- Co-Occurring Disorders
- Causes
- Symptoms
- Effects of Xanax Abuse
- Effects of Withdrawal

Xanax, the trade name of a drug called "alprazolam," is a benzodiazepine medication that is prescribed by doctors for short-term management of anxiety or sleep disorders. Xanax produces its calming effects by suppressing the inhibitory receptors in the brain and central nervous system to decrease the abnormal excitement in the brain that leads to anxiety symptoms. While most individuals who take Xanax follow the doctor's instructions, taking the drug at the proper time at the proper dose and discontinuing usage as indicated. Unfortunately for some, Xanax can become addicting if taken in large quantities over a long period of time.

Known on the street as "bars," "planks," or "zanies," Xanax abuse is ever-increasing. Some individuals combine

**888.919.5 416**

☐ *email us*

## Two

It was during my first week at Park Royal that I realized I needed to be here and that these were the people who would help me cope with my depression.

- Matt M.



Take a Virtual Tour!
Contact Us Today

Xanax with other downer drugs like opiates or alcohol in order to increase the pleasurable feelings. This can lead to negative health consequences such as respiratory arrest, coma, and death. Others use Xanax to control unwanted side effects of stimulant abuse. This combination of uppers and downers can lead to cardiovascular complications such as myocardial infarction.

The effects of Xanax abuse and addiction know no bounds. Every part of an addict's life can be altered by addiction to alprazolam. Family relationships grow strained, work productivity decreases, and the individual may begin to feel trapped in a vicious cycle of addiction. Negative health consequences may become apparent, but an addict feels trapped in a cycle of obsessing about Xanax – getting more, using more, and recovering from the effects of the drug.

With prolonged usage, individuals may become dependent upon Xanax, meaning that they rely upon the drug both physically and psychologically. In Xanax, many addicts have found a pleasant escape from everyday stressors and must relearn how to have a productive, enjoyable life without Xanax. Sober living skills often take time to develop as an individual addicted to Xanax may feel life without the drug is unbearable. Many addicts, in fact, take Xanax to feel normal and function in everyday life, as they may have come to believe that they cannot function without it. These individuals will

- Bipolar disorder
- Schizophrenia
- Stimulant abuse
- Substance abuse
- Alcoholism

# Causes

Addiction is thought to be a disease caused by multiple factors working together. Causes for Xanax addiction may include:

Genetic: Individuals who have a relative who struggles with addiction to Xanax or other substances are more likely to develop an addiction to Xanax themselves. While not a definitive indicator, there is absolutely a greater risk among family members.

Brain Chemistry: Xanax works by decreasing the excitement transmitted via neurotransmitters in the brain. Individuals who have an inborn tendency toward increased levels of these neurotransmitters may seek ways to decrease this excitement and may self-medicate with Xanax.

Environmental: Individuals who are born into an unstable home environment, especially if substance abuse is modeled by a parent or guardian, are at greater risks for developing substance abuse later in life.

Psychological: As addiction rarely occurs without the presence of another mental

illness, many individuals who struggle with undertreated or undiagnosed mental illnesses may turn to drugs or alcohol in order to manage the symptoms of their disorder.

# Symptoms

Symptoms of Xanax abuse and addiction will vary among individuals, depending upon individual genetic makeup, level of dependence, length of addiction, and amount used. Common symptoms of Xanax addiction include the following:

Mood symptoms:

- Increased anxiety
- Depression
- Mood swings
- Irritability

Behavioral symptoms:

- Doctor shopping
- Appearing drowsy
- Lying or stealing to further Xanax habit
- Stealing or borrowing Xanax from friends and loved ones
- Hiding stashes of Xanax in various places around the home, office, and car
- "Losing" multiple prescriptions for Xanax
- Lying about amount used
- Withdrawing from previously enjoyable activities
- Decline in academic or occupational functioning
- Strained interpersonal relationships
- Legal problems